AMOS A. LAWRENCE AND OTHERS *vs.* THE NEW YORK, PROVIDENCE & BOSTON RAILROAD COMPANY.

The defendants were common carriers of passengers and freight by railroad from Providence, Rhode Island, to Groton, Connecticut, connecting at Providence with a railroad from Boston and at Groton with steamboats for New York, the three having formed for several years, under a common arrangement, a through line for passengers and freight from Boston to New York. The line had a standing advertisement in a Boston newspaper that cars would leave the station there at half past five, P. M., every week day, connecting on three days named with the steamboat Commonwealth and on the alternate days with the steamboat Plymouth Rock, for New York, and that through tickets were furnished and baggage checked through to sundry places beyond New York. The defendants also by hand bills and placards advertised those two boats as running between Groton and New York in connection with their railroad. The plaintiffs, who had for a long time been in the habit of sending freight by the line, shipped a quantity of goods by it at Boston for New York, on the 28th day of December, taking bills of lading signed by an agent of all the companies forming the line, by which it was provided that the companies should not be liable for any injury to freight in the course of transportation arising from accidental delays, and that no package of goods if lost should be deemed of greater value than $200 unless specially receipted for at a greater valuation. The plaintiffs procured the bills of lading printed, and kept them in blank, to be filled up by themselves as needed. The steamboat Plymouth Rock, which was the regular boat for December 28th, had been taken off for necessary repairs, and the Commodore, a much smaller boat, belonging to the same owners, and which they were accustomed to put on in the place of either of the regular boats when taken off for repairs, was running in her place. By reason of her small capacity a large quantity of freight, which came by railroad from Boston on the evening of the 28th of December, including a part of the goods of

Lawrence *v.* New York, Providence & Boston R. R. Co.

the plaintiffs, and which the Plymouth Rock would have been able to take could not be carried, and had to be discharged, as was the custom in such cases, into the depot of the defendants at Groton to wait for the boat of the next day, and during the night was destroyed by fire with the depot. In a suit brought by the plaintiffs for the value of the goods lost, in which the jury returned a verdict for the plaintiffs for the full value of the goods, without reference to the limitation in the bills of lading, it was held, on a motion of the defendants for a new trial,

1. That the advertisement was obviously published for the information of passengers and not of freighters, and that therefore the court below erred in instructing the jury that, in determining whether there was a contract on the part of the defendants that the Plymouth Rock should be the boat for the night in question, they should particularly consider the advertisement.

2. That there was nothing in the representation of the defendants as to the boats regularly running in connection with their road that constituted a binding stipulation that one of the boats should not be taken off for necessary and usual repairs and another temporarily substituted for it.

3. That on the arrival of the goods at Groton the defendants were bound to forward by the boat of that evening only so much of the freight as the boat could take and were not responsible for the delay of the rest.

4. That all that could be required of them was to take reasonable care of the goods left over, until they should be taken by the boat of the next day.

5. That if the defendants were liable at all, it was only to an amount not exceeding $200 for each package.

The counsel for the plaintiffs having claimed to the jury that the bills of lading were taken by them under unlawful compulsion and that so they were not affected by the conditions in them, the judge charged the jury that the contract to be binding must not have been obtained by unlawful compulsion, but that the conduct of the plaintiffs in having the bills of lading printed for themselves and in filling them up and presenting them to the agent of the line to sign, was evidence from which a voluntary assent to their terms might be inferred. Held that the remarks of the judge were calculated to lead the jury to think that there might be some ground for the claim of compulsion, and that he should have told them that the conduct of the plaintiffs entirely disproved the claim.

CASE, against the defendants as common carriers, for negligence in the transportation of goods sent by the plaintiffs; brought to the Superior Court in New London county, and tried to the jury on the general issue, before *Minor, J.*

On the trial it appeared that on the 28th and 29th days of December, 1865, and for several years preceding, the Boston & Providence Railroad Company were common carriers of freight and passengers by railroad between Boston and Providence, that the defendants, the New York, Providence & Boston Railroad Company, were common carriers of freight and

passengers, by railroad between Providence and Groton, and that the owners of certain steamboats were common carriers of freight and passengers by water between Groton and the city of New York ; and that for several years before they had been, and were at this time, associated upon terms agreed upon between them, to make a through line, daily, (Sundays excepted) for the transportation of passengers and freight by their respective routes, between Boston and New York, the line being known as the Stonington line.

It further appeared that for several years prior to and until the 29th of December, 1865, the steamboats making up the steamboat part of this line were the "Commonwealth" and " Plymouth Rock," boats of sufficient capacity for all the purposes for which the line was established, and the "Commodore," a much smaller and older boat and inferior to the other two ; that the two larger boats were the boats running regularly in the line, and the Commodore a spare boat, which in case of accident to either of the others took her place ; and further, that it was necessary and usual, as often as once a year, to take off temporarily the larger boats, one at a time, for overhauling and repairs, during which withdrawal the Commodore took the place of the boat withdrawn ; that this occurred usually in the fall or winter ; that on the evening of the 28th of December, 1865, the Plymouth Rock would, if running, have been the regular boat to leave Groton for New York in the line, but had been, during all the month of December, taken off for necessary and usual overhauling and repairs as above, and the Commodore was running in her place in the line, and frequently was unable, from her smaller size, to take all the freight coming by the line from Boston for New York, as had at other times been the case, part of which was consequently left over, and went on, as on other similar occasions, the next evening by the other boat. It also appeared that the parties composing the line had at some time in the spring or summer of 1865 caused the following advertisement to be inserted in the Boston Daily Advertiser, a daily newspaper published in Boston, which was continued in that paper until the 29th of December, 1865, without change.

"*Merchants' Navigation and Transportation Company. Stonington Line, Summer Arrangement.* Cars leave the depot of the Boston and Providence Railroad, Pleasant Street, daily, Sundays excepted, at 5.30 o'clock P. M., for the Commonwealth, Capt. J. W. Williams, on Mondays, Wednesdays and Fridays, and the Steamer Plymouth Rock, Capt. J. W. Geer, on Tuesdays, Thursdays and Saturdays.   ☞ Through Tickets furnished and Baggage checked through to Philadelphia, Baltimore and Washington.   Tickets, Berths and State Rooms at this office, and at the Boston and Providence Railroad Depot.        J. W. RICHARDSON, Agent,

76 Washington Street."

It also appeared that the defendants, by placards and handbills posted and published by them from some time in the summer until the 29th of December, 1865, advertised the two boats named as the boats which were then running from Groton to New York in connection with their railroad.   In former years this line had been advertised in the newspapers as composed of the above three boats.

The plaintiffs did business in Boston, and during all the month of December, 1865, were, and for several years previous had been, sending their goods from Boston to New York over this line almost daily.   It appeared that if the Plymouth Rock had been running on the 28th of December, 1865, instead of the Commodore, the plaintiffs' goods, for which they sue, would have gone forward safely to New York, and not have been destroyed as hereinafter stated.

No advertisement was ever published, or notice given to the public, or to the plaintiffs, of an intention to withdraw the Plymouth Rock and substitute the Commodore in her place in the line during the month of December, 1865, or of the fact of such withdrawal or substitution, and any knowledge on the part of the plaintiffs as to what boats were then, or had ever been, running in the line, was such only as is to be inferred from the facts here stated.

The goods for which the plaintiffs sue consisted of thirty-three packages, a part of and included among the merchan-

dise in three bills of lading, delivered by the agent of the defendants to the plaintiffs, one of which was as follows:— the others being similar.

" BOSTON & PROVIDENCE RAILROAD CO.  NEW YORK, PROVIDENCE & BOSTON RAILROAD CO.  OWNERS OF STEAMBOATS RUNNING BETWEEN NEW YORK AND GROTON, IN CONNECTION WITH NEW YORK, PROVIDENCE & BOSTON RAILROAD CO.

[2 cts. stamp.]                    Boston, Dec. 27, 1865.

RECEIVED FROM LAWRENCE & CO.,
[Marks and Numbers.]

Twenty-six (26)     Cases ) Merchan-
Twenty-three (23)   Bales ) dise.

Marked and numbered as above, to be transported by the Boston and Providence Railroad Company to Providence; and thence by the New York, Providence and Boston Railroad Company to Groton ; and thence to New York by the Owners of Steamboats running between New York and Groton, in connection with the New York, Providence and Boston Railroad Company.

" To be delivered to said Companies in manner following, to wit : By the said Boston and Providence Railroad Company, at Providence, to the Agent for said New York, Providence and Boston Railroad Company ; by the said New York, Providence and Boston Railroad Company, at Groton, to the Agents of the said Owners of Steamboats running between New York and Groton in connection with the New York, Providence and Boston Railroad Company ; and by the said owners of Steamboats running between New York and Groton in connection with the New York, Providence and Boston Railroad Company, at the city of New York, to L. B Bacon, on payment of freight therefor ; in like good order and condition as when received by them respectively, dangers of the seas, of fire, water, breakage, leakage, and all other accidents excepted, and no package whatever, if lost, injured or stolen, to be deemed of greater value than $200, unless specifically receipted for at a greater valuation.

" And in case of any loss, detriment or damage done to or

sustained by any of the property herein receipted for, during such transportation, whereby any legal liability or responsibility shall or may be incurred, that company shall alone be held answerable therefor in whose actual custody the same may be at the time of the happening of such loss, detriment or damage.

"It is understood and agreed that the property herein receipted for, or any part thereof, may be carried on the decks of the steamboats from Groton to New York.

WM. H. MORRELL,

*Agent for the above named Companies*
*and Owners, severally, and not jointly.*"

On the back of each bill of lading was the following:—

"*The following Rules and Regulations have been adopted by the several Railroad Corporations, in regard to Freight.* ☞ALL articles of freight must be plainly and distinctly marked, or they will not be received by the Company; and when designed to be forwarded, after transportation on the Railroad, a written order must be given, with the particular line of boats or teams marked on the goods, if any such be preferred or desired. * * * * No responsibility will be admitted, under any circumstances, to a greater amount upon any single article of freight than $200, unless upon notice given of such amount, and a special agreement thereof. * * * * The Company will not hold themselves liable at all, for any injury to any articles of freight, during the course of transportation, arising from the weather or accidental delays. Nor will they guarantee any special despatch in the transportation of such articles, unless made the subject of express stipulation. Nor will they hold themselves liable, as common carriers, for such articles, after their arrival at their place of destination and unlading in the Company's warehouses, or depots."

The merchandise mentioned in these bills of lading was all delivered at Boston by the plaintiffs, to the agent of the line for transportation from Boston to New York, where the goods were to be delivered. The plaintiffs brought the bills of lading, ready filled up by themselves for the signature of

the agent of the line, and the same were then handed to and signed by the agent, and the day the goods were forwarded from Boston, "December 28th, 1865," was stamped by the agent on each bill of lading, and an internal revenue stamp of two cents was placed on each, and they were then delivered again, on the same day, to the plaintiffs, according to the usage.   On the 28th of December, 1865, all the merchandise in the bills of lading was forwarded safely by the regular through freight train, according to the usual course, and on time, by the Boston & Providence Railroad Co. to Providence, and thence by the defendants to Groton.   Immediately on its arrival at Groton the discharge of the freight in the train from the cars into the steamer Commodore was commenced, and continued until the boat was full and could not take any more.   Part of the plaintiffs' merchandise was so discharged into the boat and was safely transported that night and delivered the next day to the consignee in New York.   The remainder of the plaintiffs' goods were in cars that were partly discharged into the boat, and were, as usual in such cases, discharged at once into the depot of the defendants at Groton, to go by the next evening's boat to New York.   About 2 o'clock the next morning, December 29th, 1865, the depot, with most of its contents, including the goods for which the plaintiffs sue, amounting to thirty-three different packages, was totally destroyed by fire.

In the train which brought these goods to Groton there were several cars full of freight which had not been at all discharged at the time the boat ceased to receive, and these cars with their contents were, as usual, hauled out of the way, a distance of six or seven hundred feet from the depot, on a side track, and were not injured in the fire.   The plaintiffs' goods destroyed were at the time in the actual custody of the defendants.

It further appeared that the parties composing said line had been conducting their through business for several years, and were at the time in question so conducting it, under similar bills of lading, and that it was the regulation of the line, and their practice, not to receive goods at Boston to

transport to New York without a bill of lading for them; that the plaintiffs had for several years been in the practice of sending goods almost daily from Boston to New York by this line, upon bills of lading of the same form, which were, as in this instance, printed by the plaintiffs, (with their firm name printed in,) from blanks furnished by the Boston & Providence Railroad Company, and that the plaintiffs were in the habit, as in this case, of filling these bills in themselves, and bringing them, with the goods to be transported, to the agent of the line to be signed and delivered again to the plaintiffs when forwarded, stamped with the date of the forwarding as in the present case.

Upon this evidence the plaintiffs claimed that the defendants were liable, as common carriers, for the loss of the goods destroyed, unaffected by the provisions in the bills of lading; first, because the plaintiffs never assented to these provisions; and second, because, if they assented to them, they did so without consideration and under an unlawful compulsion and threat on the part of the defendants not to take their goods on any other terms than under these bills of lading. The defendants claimed that they received and transported the goods specially under the bills of lading, and subject to the limitations of responsibility contained therein.

On this part of the case the court charged the jury that, in the absence of special contracts, the defendants as common carriers would be liable for all losses not occasioned by the act of God or the public enemy, but that they might by special contract limit their liability; and that the bills of lading, if the terms thereof were assented to by the plaintiffs, were special contracts between the parties, and limited the liability of the defendants to the extent therein stated; but that such contracts, to be binding on the plaintiffs, must not have been made by them, or their assent thereto obtained, under unlawful threats or compulsion. The court further informed the jury that the acts of the plaintiffs in printing the bills, taking them to the agent of the line and obtaining his signature, and receiving them back from him so signed, furnished evidence

from which a voluntary assent of the plaintiffs to the terms
of the bills might be inferred.

The plaintiffs further claimed, that if the bills of lading
were special contracts, limiting the liability of the defendants,
they nevertheless imposed upon the defendants the duty of
seeing that sufficient accommodations were provided at Gro-
ton for forwarding the goods from that point to New York on
the night of the 28th of December, 1865; and that the with-
drawal of the Plymouth Rock and putting the Commodore in
her place, under the circumstances constituted a breach of
that duty and rendered the defendants liable to the plaintiffs
for the loss of which they complained.   This construction of
the bills the defendants denied, and also claimed that if such
were the construction the plaintiffs could not recover in this
action.   The court, in this part of the case, left it for the
jury to say, and charged them that they might find, whether
there was a contract or undertaking by the defendants to
carry the goods of the plaintiffs through to New York or not;
yet, if they were satisfied that there was such a contract or
undertaking, the plaintiffs could not for that reason recover
in this action, because in their declaration there was no count
adapted to such a state of facts.  And the court further charged
that, as the bills of lading did not indicate the boat that was
to run in the line on the night in question, they might
inquire, and on this point they would take into consideration
contemporaneous acts and declarations of the parties, and
particularly the Boston advertisement, whether there was
an understanding and agreement of the parties that the
Plymouth Rock was the boat to run on the night in question;
and if they were satisfied that such an understanding and
agreement existed, and that the substitution of the Commo-
dore for the Plymouth Rock, and the consequent detention
of the goods at Groton, contributed to their loss by fire, then
the defendants were liable, unless, as claimed by the defend-
ants, there was a known and established usage to substitute,
without notice, the Commodore for one of the regular boats
of the line when such regular boat was taken off for necessary

overhauling and repairs, and if there was such an usage the defendants were not liable.

The plaintiffs claimed, and introduced evidence to prove, that the destruction of their goods by fire was occasioned by the negligence and want of ordinary care of the defendants. This the defendants denied. The plaintiffs thereupon requested the court to charge the jury, that if they should find that the goods were destroyed by fire while in the actual custody of the defendants, and that their destruction was occasioned by the negligence and want of ordinary care of the defendants, the plaintiffs were entitled to recover, even if the bills of lading were special contracts between the parties, and were binding upon the plaintiffs to the fullest extent. On this point the court charged the jury that the defendants, though transporting the goods under special contracts, and subject to the limitations of liability contained in the receipts, were bound to take such care of them, while in their custody, as a man of ordinary prudence takes of his own property, and if they neglected so to do, and the destruction of the goods was occasioned by such neglect, or by any act of the defendants, such as the want of a proper boat to take the goods on the night in question, which contributed to the loss by fire, it would be their duty to hold the defendants responsible.

The plaintiffs proved the value of the thirty-three packages of their goods lost by the fire to be $11,029.51, and claimed to recover that sum, with interest from December 29th, 1865, although it should be found that the defendants transported the goods under the special contracts and subject to the limitations in the bills of lading, if their destruction was occasioned by negligence and want of ordinary care on the part of the defendants. The defendants denied their liability under the bills of lading for a greater sum than $200 a package for the thirty-three packages lost, amounting in the whole to $6,600, with interest from December 29th, 1865, in case the jury should find the loss occasioned by negligence and want of ordinary care on the part of the defendants. The

court, in this part of the case, charged the jury in accordance with the claim of the plaintiffs.

The jury returned a verdict for the plaintiffs for $12,943.13, being the whole value of the goods, $11,029.51, and interest thereon from December 29th, 1865.

The defendants moved for a new trial for errors in the charge of the court.

*Crump* and *Halsey*, in support of the motion.

*Hovey* and *Bolles*, with whom was *Wait*, contra.

HINMAN, C. J.　The plaintiffs' goods, shipped at Boston to be transported to New York, were consumed by the burning of the defendants' depot at Groton, on the night of the 28th of December, 1865. The defendants, together with the Boston & Providence Railroad Company, and the owners of certain steamboats running from Groton to New York, had for several years constituted a through line between Boston and New York for the transportation of passengers and freight; and the plaintiffs had frequently sent freight from Boston to New York by this line, taking, on shipping the goods at Boston, a bill of lading such as they took on shipping the goods in question the day before the loss. The judge at the circuit recognized these bills of lading as special contracts, limiting the liabilities of the companies constituting the line from their ordinary liability as common carriers, if the terms thereof were assented to by the plaintiffs; but he at the same time stated to the jury that such contracts, to be binding on the plaintiffs, must not have been made by them, or their assent thereto obtained, under unlawful threats or compulsion. This contract like all others must of course have been voluntarily made and not obtained under the influence of unlawful threats or compulsion. But we look in vain for any evidence of threats or compulsion, either lawful or otherwise, in the making of the contracts evidenced by these bills of lading. The plaintiffs had been so long in the business of shipping goods by this

transportation line that they had themselves caused blank bills of lading to be printed for their own convenience and were in the habit of filling up the blanks from day to day as they had occasion to use them, to be signed by the agent of the line, and to be redelivered to the plaintiffs stamped " forwarded " when the goods were forwarded as was done in this case. We do not perceive therefore how there could have been any question as to the fairness with which the bills of lading in this case were made, and the allusion to the subject by the court was rather calculated to induce the jury to think there might be some foundation for the remarks addressed to them by the plaintiffs' counsel on the subject, and thus, so far as it had any effect, it must have been to mislead them. And although the judge told the jury that the conduct of the plaintiffs furnished evidence from which a voluntary assent to the terms of the bills of lading might be inferred, we think, if he felt called upon to say anything upon the subject, he ought rather to have informed them that the conduct alluded to entirely disproved the claim that the plaintiffs accepted the bills of lading under any compulsion. These instruments were introduced in evidence by the plaintiffs themselves for the purpose of showing the receipt of the goods for transportation to New York, and as there was no evidence whatever of any unfairness on the part of the defendants with regard to them, but the contrary, they ought we think to have been treated by the court as containing the precise contract between the parties in respect to the transportation of the goods.

The liability of the defendants then must rest upon the special contract shown by the bills of lading, and the plaintiffs insist that by these instruments the defendants are liable for not forwarding the goods to New York on the evening of the 28th of December, immediately on the arrival of them at Groton, and that the withdrawal of the usual boat by which the goods would have gone forward and the substitution for her of a smaller boat which was not of sufficient capacity to take that portion of the goods which were destroyed, was a breach of their duty in this respect which rendered the defendants liable, notwithstanding such withdrawal and substi-

tution were for the purpose of necessary repairs. And on this point the plaintiffs rely principally upon the advertisement which the agent of the line had previously caused to be published in a newspaper and posted in placards and handbills, in which the steamboats Commonwealth and Plymouth Rock were mentioned as the boats running in connection with the railroads, constituting with those boats the through line to New York. But the advertisement and placards in question are not addressed to the shippers of freight by the line, and do not in any way allude to the subject of freight. They merely state when the cars leave Boston for the Commonwealth on certain days and for the Plymouth Rock on certain other days, and state that through tickets will be furnished and baggage checked through to Philadelphia, Baltimore and Washington, and that tickets, births and state-rooms can be obtained at the offices of the line in Boston and Providence. The advertisement thus shows for itself that it was published for the information of passengers and not of freighters. We think therefore that the court erred in submitting it to the jury to find whether there was a contract or agreement of the parties that the steamboat Plymouth Rock was the boat to run in the line on the night in question, and in instructing them that on this point they should particularly take into consideration the advertisement mentioned.

Again, the special contract contained in the bills of lading provided " that no responsibility will be admitted under any circumstances to a greater amount upon any single article of freight than two hundred dollars, unless upon notice given of such amount, and a special agreement therefore." But the court charged the jury, in conformity with the claim of the plaintiffs on this point, that the plaintiffs were entitled to the full value of the goods contained in the thirty-three packages which were lost by the fire, and by reason of this the plaintiffs had a verdict of from four to five thousand dollars more than they would have had if this stipulation had been recognized. This was clearly wrong. There was no claim or pretense of any gross negligence on the part of the defendants. They stored the goods in their depot because the boat that

evening was so full that it could not take them. They had therefore to lie over for the boat of the following day ; and in the meantime they were destroyed by an accidental fire. And it is admitted that no notice was given of the value of the packages beyond two hundred dollars. We think therefore that the most the plaintiffs should have been permitted to recover is two hundred dollars for each package, instead of the full value of the packages.

But we are not satisfied that the plaintiffs are entitled to recover anything. The defendants had carried the goods safely to Groton, and so many of them as could be were put upon the boat that went to New York that evening, and the rest were properly stored in their depot for transportation by the boat of the succeeding day. Now the contract evidenced by the bills of lading does not stipulate for the transportation of the goods by the boat of the day when they are forwarded from Boston. They were to be delivered at Groton to the agent of the owners of steamboats running between New York and Groton in connection with the railroad of the defendants ; and the owners of these boats stipulate that they will deliver them in New York to the consignee, &c. And there is a stipulation that the carriers shall not be liable for any injury to freight arising from the weather or accidental delays. Now the delay in this instance was caused by the necessity of taking off the Plymouth Rock for necessary repairs. Is not that an accidental delay within the terms of this stipulation ? But the court, while correctly stating the liability of the defendants for any want of ordinary care while the goods were in the depot at Groton, added, as we think improperly, " or by any act of the defendants, such as the want of a proper boat to take these goods on the night in question which contributed to this loss by fire ; " thus making the defendants liable for the want of capacity of the boat of that evening to take the goods. It appears to us that for this the defendants are not liable ; and for these reasons we advise the Superior Court to grant a new trial.

In this opinion the other judges concurred.